UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

№ 05-CV-122 (JFB) (ETB)
_____

DEAN NASCA,

Plaintiff,

VERSUS

THE TOWN OF BROOKHAVEN, RICHARD PALAZZOTTO, EDWARD H. MCCARTHY,
GEOFFREY H. PFORR, KRAL, CLERKIN, REDMOND, RYAN, PERRY & GIRVAN, LLP,
AND JOHN DOES 1-10 SAID NAMES BEING FICTITIOUS AND INTENDING TO REPRESENT
EMPLOYEES, AGENTS AND ASSIGNS OF THE TOWN OF BROOKHAVEN,

Defendants.
_____

MEMORANDUM and ORDER
September 25, 2008
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Dean Nasca (hereinafter, "Nasca" or "plaintiff") brings this action against the Town of Brookhaven (hereinafter, "Brookhaven" or the "Town"), and Richard Palazzotto (hereinafter, "Palazzotto"), Edward H. McCarthy, Geoffrey H. Pforr, Kral, Clerkin, Redmon, Ryan, Perry & Grivan, LLP, and John Does 1-10 said names being fictitious and intending to represent employees, agents and assigns of the Town of Brookhaven (hereinafter, collectively, the "defendants"), asserting violations of 42 U.S.C. §§ 1982, 1983, 1985, and 1986, based upon alleged violations of his Fourth, Fifth, and Fourteenth Amendment Rights under the Constitution. Specifically, Nasca alleged in the complaint that Building Inspector Palazzotto's entrance onto his property in October 2003 – namely, his entrance onto his driveway and porch which led to the issuance of a Notice of Violation for, among other things, having an unsafe chimney – constituted an illegal search and seizure in violation of the Fourth Amendment.[1] Over the course of this

---

[1] In his reply affidavit and at oral argument, plaintiff argued that he was not asserting that the entry onto his property was a Fourth Amendment violation, but rather that his Fourth and Fourteenth Amendment rights were violated by the Town's failure in 1997 to either approve or deny plaintiff's application for a renewal of an accessory apartment. In an abundance of caution, the Court has analyzed *pro se* plaintiff's claim as originally stated in the complaint, and as revised in his reply, and concludes that the claim cannot survive

litigation, Nasca has articulated other claims including, among other things, a contention that the Code of the Town of Brookhaven (hereinafter, "the Code") 82-4(A)(1), which makes it unlawful to rent property to a non-immediate family member without a rental occupancy permit, is unconstitutional.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has also cross-moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motion is granted in its entirety on the federal claims and plaintiff's cross-motion is denied. Finally, given that the federal claims do not survive summary judgment, the Court declines to exercise supplemental jurisdiction over the pendent state law claims.

I. BACKGROUND

A. Facts

The facts described below are taken from the parties' depositions, affidavits, exhibits and the parties' Local Rule 56.1 statement of facts. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to plaintiff, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005).

Plaintiff Dean Nasca resides at 89 Gillette Avenue in Bayport, New York ("Gillette Avenue"), and has lived there for the past ten years with his wife and family. (Defs.' 56.1 ¶ 2.) The plaintiff also owned the subject premises located at 23 Plaza Lane, Selden, New York ("Plaza Lane" or the "premises"), with his father, Thomas Nasca. (Defs.' 56.1 ¶ 3.) Nasca and his father purchased the premises in 1989 for $150,000. (Defs.' 56.1 ¶ 4.) Nasca had lived at Plaza Lane from October of 1989 through May of 1995, when he moved to Gillette Avenue. (Defs.' 56.1 ¶ 5.) Nasca's father has never lived at the Plaza Lane property. (Nasca Dep. 11:6-7.) Nasca asserts that, even after moving out of Plaza Lane, he continued to retain a portion of the dwelling. (Nasca Dep. 8:4-7.)

The premises located at Plaza Lane had an accessory apartment on the second floor during the period of time that Nasca resided there. (Defs.' 56.1 ¶ 6.) An "accessory apartment" is defined by § 85-(1)(B) of the Code as a "dwelling unit which is subordinate to a permitted principal one-family residence use in terms of size, location and appearance and is located within the principal structure." Code § 85-201(B)(1) requires owner occupancy of a premises containing an accessory apartment. Section 85-201 of the Code requires that the owner of a premises with an accessory apartment obtain a special permit which is initially valid for a three-year period and thereafter renewable for five-year periods. Pursuant to § 85-201(B)(10) of the Code, the accessory apartment permit terminates upon the death of the owner or the survivor of the owner, upon the transfer of title to the premises, or upon the owner no longer occupying the premises as a principal residence. Pursuant to § 82-4 of the Code, a rental occupancy permit is required for the owner of a dwelling unit to "use, establish, maintenance, operate, let, lease, rent or suffer or permit the occupancy and use thereof as a rental occupancy by someone other than the owner or his immediate family." According to Section 82-1(A) of the Code, the legislative

---

summary judgment under either theory.

2

intent of Chapter 82 was to "preserve the aesthetic integrity of our residential neighborhoods, prevent neighborhood blight, protect residential property values, encourage residential property maintenance and enhance the quality of life in our residential neighborhoods."

At the time the plaintiff purchased the Plaza Lane premises in 1989, there was an accessory apartment permit for the second floor which had been transferred to the plaintiff. (Defs.' 56.1 ¶ 13.) Nasca renewed the accessory apartment permit several times during the period of time that he owned the Plaza Lane premises. (Defs.' 56.1 ¶ 14.)

The Certificate of Occupancy for the subject premises was issued on February 1, 1967, for use of the premises as a one-family framed dwelling. (Pforr Aff., Exh. C.) The plaintiff rented the Plaza Lane premises to tenants from May of 1995 until the house was sold in June of 2005. (Defs.' 56.1 ¶ 18.)

On March 31, 1997, Nasca submitted a renewal application for accessory apartment use for the Plaza Lane premises. (Pl.'s 56.1 ¶ 1.) Additionally, Nasca notified the Town of Brookhaven that any previous Inspection Affidavit consent form was revoked and that Nasca no longer consented to periodic inspections of the subject premises without prior written consent of either Dean Nasca or Thomas Nasca. (Pl.'s 56.1 ¶ 2.) The Town received the application, letter, and fee in the amount of $250.00 for renewal of the accessory apartment permit. (Pl.'s 56.1 ¶ 3.) The Town did not approve or deny the renewal application for an accessory permit for the property, but rather failed to act. (Pl.'s 56.1 ¶ 4.)

In 2000, Nasca received a letter from the Town advising him that a rental permit was needed for non-owner occupied dwellings. (Defs.' 56.1 ¶ 15.) In 2000, Nasca did not apply for a rental registration permit because he believed that the legislation requiring the permit was unconstitutional. (Nasca Dep. 18:4-12.)

On June 27, 2000, Building Inspector Carlo Fusco ("Fusco") sent Nasca a Notice of Complaint for an unregistered rental house located at 23 Plaza Lane. In a letter dated July 7, 2000, Nasca responded to Fusco. (Pl.'s 56.1 ¶ 8.) The letter specifically stated that no individual from the Town may enter upon any portion of the Plaza Lane Property prior to receiving written consent from either Dean or Thomas Nasca. (Pl.'s 56.1 ¶ 8.)

Section 82-1 of the Code, entitled "Legislative Intent," provides that Chapter 82 applies to all "dwelling units within the Town of Brookhaven other than property located in the Great South Beach (Fire Island), which will be regulated by § 85-107.1 of the Code of the Town of Brookhaven." (Code of the Town of Brookhaven §82-1.) The Town issued a Legal Notice scheduling a public hearing for October 15, 2002 concerning the amendment of the Code §§ 85-170.1, 170-2, 170.3, and 170.4, pertaining to the seasonal rentals within the Great South Beach on Fire Island. (Pforr Aff. Exh. K.) The plaintiff's former premises located at 23 Plaza Lane is not located on the Great South Beach on Fire Island.

In October of 2003, Nasca received a "Notice of Violation" letter dated October 15, 2003 that was signed by Richard Palazzotto, CCI, Senior Building Inspector for the Town of Brookhaven, informing Nasca that the Plaza Lane premises was in violation of New York State Building Code Section FG503.5.6.3 for having an unsafe chimney and was in violation

3

of the Code of the Town of Brookhaven 82-4(A)(1) for failing to have a rental permit. (Nasca Dep. 39:21-40:2; Pforr Aff. Exh. C.) Palazzotto went to the Plaza Lane premises and knocked on the door, but no one answered. (Palazzotto Dep. 12:20-25.) As Palazzotto was walking up the driveway, he observed that the chimney, located on the right side of the house, was unsafe in that it was pulling away from the house. (Palazzotto Dep. 20:23-21:13.) Palazzotto believed that Nasca did not live at the premises in October 2003 based on a check of Cole's Directory, which is a reverse phone book that lists the addresses and occupants of residences. (Palazzotto Dep. 20:4-9.) Neither Dean Nasca nor Thomas Nasca ever received any summonses or appearance tickets from the Town, relative to the Plaza Lane premises, (Nasca Dep. 49:7-17), nor did the Town ever commence any litigation against them relative to the Plaza Lane property. (Nasca Dep. 49:18-21.)

In June of 2005, Nasca put the Plaza Lane premises on the market and eventually sold the property for $367,000. (Nasca Dep. 27:7-11.)

B. Procedural History

Nasca commenced this action on January 10, 2005, alleging violations of his civil rights, pursuant to 42 U.S.C. §§ 1982, 1983, 1985, and 1986. In support of these claims, Nasca alleged violations of his Fourth, Fifth and Fourteenth Amendment rights under the Constitution. On February 8, 2005, defendants answered the complaint. On February 29, 2008, defendants filed a motion for summary judgment. On March 5, 2008, defendants filed an amended motion for summary judgment. On May 30, 2008, plaintiff filed his opposition to defendants' motion for summary judgment and cross-moved for summary judgment. On June 16, 2008, defendants filed their reply and an opposition to plaintiff's cross-motion for summary judgment. On June 30, 2008, plaintiff filed his reply. Oral argument was held on July 25, 2008. The Court has carefully considered all the submissions by the parties.

II. DISCUSSION

A. Summary Judgment Standard

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson*, 477 U.S. at 248 (holding summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *Rivkin v. Century 21 Teran Realty LLC*, 494 F.3d 99, 103 (2d Cir. 2007). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may

be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

Moreover, where the plaintiff is proceeding *pro se*, the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir. 2002) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)). Though a *pro se* litigant's pleadings are afforded wide latitude, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Instead, to overcome a motion for summary judgment, the non-moving party "must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997) (internal citations omitted); *see also Morris v. Ales Group USA, Inc.*, No. 04-CV-8239 (PAC), 2007 U.S. Dist. LEXIS 47674 2007 U.S. Dist. LEXIS 47674, at *10 (S.D.N.Y. June 28, 2007) ("[T]o survive summary judgment, plaintiff's facts 'must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.'") (quoting *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n.14 (2d Cir. 1981)).

B. Plaintiff's Claims Arising Under 42 U.S.C. § 1983

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n. 3 (1979). Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects,

or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. For claims under § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

Plaintiff's complaint focused specifically on the Town's Building Inspector entering his property in October 2003 and "charging him with various violations of ordinances and other laws of the Town of Brookhaven knowing the said charges were false and untrue." (Compl. ¶ 20.) Plaintiff generally alleges that this conduct – involving an alleged unlawful search and "bogus and false" complaints of Code violations – "deprived the plaintiff of the following rights, privileges and immunity secured to him by the Constitution of the United States and State of New York: The right of the plaintiff to be secure in their person against unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the Constitution of the United States of America; the right of the plaintiff not to be deprived of the right of due process of law secured by the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States of America; The right of the plaintiff to be paid adequate compensation for the taking of their property under the Fifth and Fourteenth Amendment to the Constitution of the United States of America; The right of the plaintiff under Section 42 U.S.C. Sections 1982, 1983, and 1985, to redress of Constitutional violations and Civil Rights violations guaranteed by the Civil Rights Act." (Compl. ¶¶ 25-26.)

However, it appears that, during discovery and the briefing of his opposition to the summary judgment motion, plaintiff has switched his focus away from the conduct of the Building Inspector to other purported theories of Section 1983 liability based upon, for instance, (1) the failure to act on his 1997 application for renewal of an accessory apartment, or (2) the distinctions in the rental laws between residents of mainland Brookhaven and Fire Island. Although the Court is troubled by plaintiff's constructive amendments to his complaint as the case has proceeded, the Court has attempted to address these newly-asserted theories of liability, which were briefed by the defendants. As discussed in detail below, after a careful review of plaintiff's claims (construing them to raise the strongest arguments possible) in light of the record, the Court concludes that summary judgment is warranted on all the federal claims because there is no evidence from which a reasonable jury could conclude that the alleged conduct of the defendants "deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider*, 188 F.3d at 53 (citation omitted).

1. Plaintiff's Fourth Amendment Claim

In the complaint, Nasca alleges that Palazzotto violated his Fourth Amendment rights when Palazzotto "attempted to gain entry to the plaintiff's premises without a valid search warrant therefore, causing the search of the premises thereon." (Pl.'s Compl. ¶ 23.)

Defendants argue that Palazzotto never entered the premises and that plaintiff had no reasonable expectation of privacy as to his driveway or porch. In his reply papers and at oral argument, notwithstanding the language in his complaint, plaintiff stated that he was not attempting to argue that the alleged trespass was a violation of his Fourth and Fourteenth Amendment rights; rather, plaintiff asserted that his Fourth and Fourteenth Amendment rights were violated by the defendants' failure in 1997 to act on his application for a renewal of an accessory apartment permit. (*See* Nasca Reply Affidavit, at ¶ 11 ("Nowhere in ¶'s 20-27 of the complaint does plaintiff allege that the trespass was a violation of my Fourth and Fourteenth Amendment rights. Plaintiff's Fourth and Fourteenth Amendment rights were violated when the Town of Brookhaven failed to either approve or deny plaintiff's application for a renewal of an accessory apartment permit.").) Although plaintiff appears to have abandoned any constitutional claim based on an alleged trespass on his property, the Court, in an abundance of caution, briefly analyzes that claim below and concludes that it fails as a matter of law.[2]

The Supreme Court has recognized that "administrative searches [by municipal health and safety inspectors] are significant intrusions upon the interests protected by the Fourth Amendment, and that such searches when authorized and conducted without a warrant procedure, lack the traditional safeguards which the Fourth Amendment guarantees to the individual." *Camara v. Mun. Ct. of S.F.,* 387 U.S. 523, 534 (1967). However, the present case is distinguishable from *Camara,* in that an administrative search under the Fourth Amendment was not conducted by Palazzotto.

"The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo,* 476 U.S. 207, 211 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). "Society does not regard as reasonable a person's subjective expectation of privacy to that which he knowingly exposes to the public." *Beganskas v. Babylon,* Nos. 03-CV-0287 (DLI)(JO), 04–CV-5693 (DLI)(JO), 2006 WL 2689611, at *2 (E.D.N.Y. 2006) (citing *Katz*, 389 U.S. at 351). It is well-settled that, although the Fourth Amendment protects the home and its curtilage, such protection does not extend to the home's "open fields" because those areas "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance." *United States v. Oliver,* 466 U.S. 170, 179 (1984). Thus, "the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Id.* at 177; *see also Hester v. United States,* 265 U.S. 57, 59 (1924) ("[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law."). The reason for the "open fields" doctrine is very clear – "what a person exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 347.

---

[2] The Court will analyze *infra* the new constitutional claim raised for the first time by plaintiff in his reply papers and also finds that summary judgment on any such claim is also warranted.

Applying this precedent, the Second Circuit has noted that "[t]he route which any visitor to a residence would use is not private in the Fourth Amendment sense." *United States v. Reyes,* 283 F.3d 446, 465 (2d Cir. 2002) (quoting Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(e), at 499 (3d ed. 1996) (footnotes omitted)). Similarly, a "visual observation" of an object already exposed to public view is no search at all." *Palmieri v. Lynch,* 392 F.3d 73, 81 (2d Cir. 2004). In *Beganskas*, a Suffolk County Department of Health employee conducted a cursory inspection of a house along the driveway and up to the door, as a result of potential health code violations. *Beganskas,* 2006 WL 2689611, at *3. The court held that where "[an inspector's] visit was limited to areas that any visitor would use given that he merely walked around the perimeter of the her front yard and up her driveway to the front door where he looked through a window," no administrative search occured and no Fourth Amendment rights were implicated. *Id.*

Similarly, in the instant case, Palazzotto went to the Plaza Lane premises and knocked on the door, but no one answered. (Palazzotto Dep. 12:20-25.) As Palazzotto was walking up the driveway, he observed that the chimney, located on the right side of the house, was unsafe in that it was pulling away from the house. (Palazzotto Dep. 20:23-21:13.) Palazzotto used the route which any visitor to the property would have used. His observation that the chimney was unsafe was a visual observation and the chimney was already exposed to public view.

In sum, based upon the undisputed facts regarding Palazzotto's visit to the property, it is clear that, as a matter of law, plaintiff cannot demonstrate that Palazzotto's entry onto his driveway or porch violated the Fourth Amendment because plaintiff had no reasonable expectation of privacy as to his driveway or porch. *See Nasca v. County of Suffolk,* No. 05-CV-1717, 2008 WL 53247, at *4-8 (E.D.N.Y. Jan. 2, 2008) (granting defendants' summary judgment motion on Section 1983 claim because police officer's entry onto plaintiff's driveway to issue a traffic summons did not implicate the Fourth Amendment). Accordingly, summary judgment in defendants' favor is granted as to this claim.

2. Plaintiff's Fifth Amendment "Takings" Claim

Plaintiff also appears to assert that § 82-4 of the Code, requiring non-owner occupied residential dwellings to obtain a rental permit, amounts to an unconstitutional "taking" under the Fifth and Fourteenth Amendments. As discussed below, any such claim cannot survive summary judgment because, among other things, there is simply no evidence in the record to rationally support a finding that the application of the rental permit law to plaintiff's property constituted a "taking" under the Fifth Amendment.

The Fifth Amendment guarantees that no one will "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use." U.S. Const. amend. V. "[T]he Fifth Amendment is deemed to allow state and local governments broad power to regulate housing conditions without paying compensation for all resulting economic injuries." *Sadowsky v. City of New York,* 732 F.2d 312, 317 (2d Cir. 1984).

In *Lingle v. Chevron U.S.A., Inc.,* the Supreme Court held that a plaintiff who seeks

8

to challenge a government regulation as an uncompensated taking must proceed under one of the following theories: (1) alleging a "physical" taking as the result of a permanent physical invasion of the property, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); (2) alleging a "total regulatory taking" which completely deprives the owner of "all economically beneficial use," *see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992); (3) alleging a taking which does not rise to the level of a "physical" taking or "regulatory taking," *see Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 137-38 (1978); or (4) alleging an impermissible land use exaction, *see Nollan v. California Coastal Comm'n*, 483 U.S. 825, 853 (1987); *Dolan v. City of Tigard*, 512 U.S. 374, 389-90 (1994). *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 548 (2005). Nasca's claim can properly be categorized as a "*Penn Central*" taking, a taking which does not rise to the level of a physical or regulatory taking.

As noted by the Court in *Lingle,* when conducting a *Penn Central* analysis the court must consider: (1) "[t]he economic impact of the regulation on the claimant and particularly the extent to which the regulation has interfered with distinct investment-backed expectations"; and (2) "the character of the governmental action – for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits of the economic life to promote the common good." *Lingle*, 544 U.S. at 538-539 (internal quotation marks omitted) (citing *Penn Central*, 438 U.S. at 124). The Court further stated that "the *Penn Central* inquiry turns in large part, albeit not exclusively upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540. "[A] taking is less likely to be found when the challenged interference with a property interest 'arises from some public program adjusting the benefits and burdens of economic life to promote the *common good*,' . . . than when the interference entails a physical invasion of the property by the government." *Sadowsky*, 732 F.2d at 317 (quoting Penn Central, 438 U.S. at 124) (emphasis added).

Here, it appears that Nasca is claiming that the Town Code provision requiring a rental permit restricted his ability to rent the property and, therefore, resulted in a taking. In *Sadowsky*, the court stated that, "regarding economic impact, it is clear that prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking has occurred." 732 F.2d at 317. The Second Circuit further stated that the critical question is not whether the regulation allows the property to be used in a "profitable" manner, but whether the property use allowed under the regulation would be "sufficiently desirable" to allow a property owner to "sell the property to someone for that use." *Id.* at 318; *see also Loretto,* 458 U.S. at 436 (holding that "deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking"); *Pompa Construction Corp. v. Saratoga Springs*, 706 F.2d 418, 424 (2d Cir. 1983) (holding that "the key question" in determining whether a local zoning ordinance was so economically burdensome as to constitute a taking, is whether others "might be interested in purchasing all or part of the land" for permitted uses).

The undisputed facts in this case demonstrate that plaintiff, as a matter of law, cannot demonstrate that a "taking" has resulted from the existence of this rental permit law. In

9

particular, it is undisputed that, after receiving the Notice of Violation, plaintiff continued to rent out the subject premises without the permit, even though it was in violation of the Town's rental permit law. Moreover, the Town never subjected plaintiff or his property to any administrative proceeding or sanction whatsoever for his failure to comply with the rental permit law. Given these undisputed facts, it is clear that plaintiff's property was never subjected to a Fifth Amendment "taking." To the extent that plaintiff argues that this existence of this permit procedure (even without any sanctions against him) had some negative impact on the value of this property, that argument is both factually and legally unsupported. As a threshold matter, the undisputed facts show that plaintiff purchased the property in 1989 for $150,000 and sold the property in 2005 for $367,000. (*See* Defs.' 56.1 ¶ 4; Nasca Dep. 27:7-11.) Thus, there is no evidence that plaintiff was inhibited from selling the property as a result of the regulation or that it negatively impacted him economically in any way. In any event, even assuming *arguendo* that there was some decline in plaintiff's property value due to the existence of the permit law, such evidence is insufficient as a matter of law to constitute a "taking" under the Fifth Amendment, or even a deprivation of property under Fourteenth Amendment. *See, e.g., BAM Historic District Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983) (holding that, where plaintiff brought Due Process claim alleging that City's action did not destroy use or value of property, but would cause a decline in property values, "[g]overnmental action of that sort has never been held to 'deprive' a person of property within the meaning of the Fourteenth Amendment").

The case at bar is similar to *Palmieri v. Town of Babylon*, No. 01 CV 1399 (SJ), 02 CV 6075 (SJ), 2006 WL 1155162 (E.D.N.Y. Jan 6, 2006). In *Palmieri*, the plaintiff claimed that a rental permit law, enacted by the Town of Babylon, restricted his ability to rent the property and resulted in a taking, in violation of the Fifth Amendment. 2006 WL 1155162, at *1. The court dismissed the claim, holding that plaintiff had clearly been able to derive rental income despite the law and, thus, could not establish a "taking." *Id.* at *9. In particular, the Court explained:

> Here, Plaintiff has made it clear his use of the Property was primarily to derive rental income. In fact, by all accounts he was successful in this endeavor, even despite the existence of the Rental Permit Law. And, as noted, he earned a substantial profit on the sale. Thus, it is not clear there was even any economic impact on him. However, even if he had been deprived of some economic return because of the Rental Permit Law, that alone would not suffice to rise to the level of a taking without just compensation.

*Id.* (citations omitted). The court further found that the law was "a reasonable exercise of the Town's power to ensure the safety of certain residents who rent." *Id.* As the court noted, "the value to the public good of ensuring rental properties meet certain minimum safety standards cannot seriously be in question, even if individual property owners are forced to bear the cost of making required improvements to their rental properties in return for a permit. The law is clear on this point – and not in a way that favors Plaintiff." *Id.*

10

This Court agrees with the legal analysis in *Palmieri* and concludes, based upon the record in this case, that plaintiff has not set forth any evidence of harm with respect to his use of the property that is cognizable as a "takings" violation under the Fifth Amendment.

Accordingly, summary judgment is warranted in favor of defendants as to plaintiff's Fifth Amendment "takings" claim.

3. Plaintiff's Equal Protection Claim

Plaintiff asserts that Chapter 82 of the Code violates his rights under the Equal Protection Clause of the Fourteenth Amendment. Specifically, plaintiff argues his rights are violated by § 82-4, which requires owners of non-owner occupied residential rental properties, other than those located on the Great South Beach (Fire Island), to obtain a rental permit. Plaintiffs' contention is that there is no rational basis for requiring a rental permit for properties on mainland Brookhaven, but not requiring such permits on Fire Island.[3]

Defendants argue that the intent of Chapter 82 is to "protect the safety of those living in non-owner occupied residential dwellings." (Defs.' Reply, at 5.) Defendants further argue that property on Fire Island is excluded from the provision due to the "unique characteristics" of Fire Island and not because of any "suspect classification." *Id.* As noted by the defendants, this provision was enacted because the Town determined that

> there exists in the Town of Brookhaven serious conditions arising from non-owner occupied rental of dwelling units in one, two and three family and multiple dwellings that are substandard or in violation of the New York State Uniform Fire Prevention and Building Code, Building Rehabilitation Code, Electrical Code, Fire Prevention Code, Plumbing Code, and other codes and ordinances of the Town. Many of these dwellings are inadequate in size, overcrowded and dangerous, and such dwelling units pose hazards to life and limb and property of residents of the Town and others, tend to promote and encourage deterioration of the housing stock of the Town, create blight and excessive vehicle traffic and parking problems and to overburden municipal services. The Board finds that current Code provisions are inadequate to halt the proliferation of such conditions and that the public health, safety, welfare and good order and governance of the Town will be enhanced by enactment of the regulations set forth in this chapter, which regulations are remedial in nature and effect.

(Pforr Aff. Exh. J, § 82-1 (B).)

The Equal Protection Clause of the

---

[3] As an initial matter, the Court again notes that this theory of Section 1983 liability is not mentioned or referenced in any way in the complaint. Nevertheless, the Court has addressed the merits of this claim and, as discussed below, finds that it cannot survive summary judgment.

11

Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." *Latrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). An individual not alleging invidious discrimination on the basis of membership in some group may nevertheless prevail on an equal protection claim under the "class of one" theory recognized by the Supreme Court in *Willowbrook v. Olech*. Under a "class of one" equal protection claim, a plaintiff must show that (1) "[he] has been intentionally treated differently from others similarly situated and" (2) "there is no rational basis for the difference in treatment." *Willowbrook*, 528 U.S. at 564; *see also Giordano v. City of New York*, 274 F.3d 740, 743 (2d Cir. 2000).

As set forth below, plaintiff does not contend that he is being subjected to invidious discrimination based upon membership in a protected class. Thus, the Court construes his claim to be a "class of one" claim. However, as discussed below, any such Equal Protection claim cannot survive summary judgment in the instant case.[4]

In *Neilson v. D'Angelis,* the Second Circuit recently addressed plaintiff's burden in an *Olech* "class of one claim." 409 F.3d 100, 104 (2d Cir. 2005). In *Neilson,* the Court held that where as here, plaintiff is claiming a "class of one" claim, plaintiff must establish that "the level of similarity between plaintiff[] and the persons with whom [he] compare[s] [himself] must be extremely high." *Id.* at 104; *see also Cordi-Allen v. Conlon,* 494 F.3d 245, 251-52 (1st Cir. 2007) ("The 'similarly situated' requirement must be enforced with particular rigor in the land-use context because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.' *Olech*, 528 U.S. at 565 (Breyer, J., concurring). Given this template, virtually every zoning decision-in the absence of a sensible limiting principle-would be a candidate to find its way to federal court in the guise of an equal protection claim.").

A "class of one" plaintiff must establish that he was treated differently than someone who is "'*prima facie identical in all relevant respects*'" *Neilson,* 409 F.3d at 104. (emphasis added) (quoting *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). The Second Circuit stated that such a high threshold was required because the "existence

---

[4] As an initial matter, the Court notes that, in *Engquist v. Oregon Department of Agriculture*, 128 S.Ct. 2146 (2008), the Supreme Court recently addressed "class of one" claims and declined to apply this doctrine in the context of public employment. The *Engquist* court reasoned that "[if] plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim." *Id.* at 2156. Although the *Engquist* decision was applied in the public employment context, the analysis by the Supreme Court suggests that "class of one" challenges can only be made to non-discretionary decisions. Therefore, to the extent plaintiff is challenging the discretionary decisions by the Town as to the enforcement of its permit laws and code provisions, *Engquist* suggests that "class of one" challenges cannot be asserted as to such decisions. In any event, the Court has assumed that plaintiff's claims survive *Engquist* and, after analyzing plaintiff's claims under the "class of one" standard, concludes that they cannot survive summary judgment for the reasons discussed *infra*.

12

of persons in similar circumstances who received more favorable treatment than plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that lack any reasonable nexus with a legitimate governmental policy." *Neilson,* 409 F.3d at 104. Therefore, "[t]he similarity and equal protection inquiries are . . . virtually one and the same in . . . a 'class of one' case." *Id.* The court held that an *Olech* plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson,* 409 F.3d at 105; *see also Blackhawk Sec., Inc. v. Town of Hamden*, No. 03-CV-2101, 2005 WL 1719918, *5 (D. Conn. July 22, 2005) ("[T]he relevant question is whether [plaintiff] and [comparators] are so similar that *no rational person* could regard their differential treatment as justified on the basis of a legitimate governmental policy.") (emphasis in original).

Based on the undisputed facts of this case, the Court concludes that no rational jury could find that plaintiff has satisfied the first prong of the *Neilson* test. In particular, plaintiff has put forth no evidence to support his contention that his property on "mainland" Brookhaven is *prima facie* identical to those of property owners on the Great South Beach of Fire Island. *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 160 (2d Cir. 2006) (finding that two proposed development projects were not "similarly situated" for purposes of an equal protection "class of one" claim where properties involved different types of housing and density levels); *see also Campbell v. Rainbow City,* 434 F.3d 1306, 1314-15 (11th Cir. 2006) (holding that, in the land use context, two properties are not considered *prima facie* similar, where the comparators are engaged in a different type of land use).

In any event, even assuming *arguendo* that plaintiff is similarly situated to property owners on Fire Island, defendants have provided a rational basis for excluding properties located on Fire Island from the rental registration requirements of Chapter 82 of the Town Code and, instead, subjecting residential properties to the separate framework in Article XVI of Chapter 85 of the Town Code – namely, the need to facilitate seasonal rentals on Fire Island. The Town Board enacted Article XVI "[i]n order to promote the health, safety and welfare of residents and visitors" on Fire Island, among other reasons. *See* Section 85-165(B)(1). In doing so, the Town Board recognized "the unique characteristics of Fire Island communities" and adopted that Article "to encourage the most appropriate use of the land throughout said communities." *See* Section 85-165(B)(2); *see also* Section 85-167(B) ("Legislative Intent. The Town Board recognizes the unique characteristics of Fire Island. The Town Board encourages land use which is consistent with the characteristics of Fire Island and which constitutes wise resource management. To this end and in order to promote the health, safety and welfare of the public, the Town Board of the Town of Brookhaven has enacted this section.")

Although Article XVI is different in certain respects from the requirements for rental properties located in other parts of the Town, Article XVI clearly gives effect to the Town's interest in protecting the safety of the residents of Fire Island, while at the same time protecting the "unique characteristics" of Fire Island and facilitating the economic benefits of seasonal rentals within the Great South Beach of the Fire Island National Seashore.[5] Certainly, the articulated difference in occupancy patterns, as well as economic considerations and the unique nature of the Fire Island National Seashore, would rationally support excluding properties on Fire Island from the rental registration requirements of Chapter 82 of the Town Code for properties on mainland Brookhaven. The Town, therefore, has a rational basis in treating property located on the Great South Beach, a seasonal/vacation community, differently from mainland Brookhaven, a year-round community. As the Supreme Court has stated, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. . . . [And w]hen social or economic legislation is at issue, the Equal Protection Clause allows the [legislature] wide latitude." *City of Cleburne*, 473 U.S. at 440. Although plaintiff makes conclusory arguments challenging the rational basis supporting the distinction between Fire Island and mainland Brookhaven, he cites no evidence which undermines the rational basis or suggests that the Town is acting in an arbitrary and irrational manner.[6] Thus, based on the record in this case, viewed in the light most favorable to plaintiff, the Court concludes that no reasonable juror could find that plaintiff has satisfied his burden of demonstrating that there is no rational basis for the difference in treatment.[7] *See, e.g., Palmieri*, 2006 WL 1155162, at *7-8 (rejecting Equal Protection Claim and finding that the Rental Permit Law is rationally related to a legitimate state interest).

---

[5] As further evidence of this rational intent, the Town points to a legal notice dated September 17, 2002, scheduling a public hearing for October 15, 2002, concerning an amendment of the Town Code to enact Sections 85-170.1 to 170.4, which contained the proposed Section 85-170.3 that provided for a "seasonal rental permit" to be issued by the Chief Building Inspector for those units that are intended to be rented out for the season. The Town contends that this is part of the clear evidence that exists to support a rational basis for treating "mainland" Town of Brookhaven, which is a year-round community, differently from Great South Beach (Fire Island), which is primarily a seasonal/vacation community.

[6] Although in his Reply Affidavit plaintiff attempts to challenge other distinctions in the Code between mainland Brookhaven and Fire Island (such as the number of individuals who can occupy a residential building), such claims similarly fail as a matter of law because of plaintiff's failure to present any evidence to undermine the rationale for such distinctions that is apparent from the face of the Code, as discussed above.

[7] Similarly, to the extent that plaintiff is seeking to assert a selective enforcement claim under the Equal Protection Clause based upon some malice or bad faith attempt to injure him, plaintiff has presented no evidence to support an inference that the differing treatment between residents of mainland Brookhaven and Fire Island on rental properties was motivated by an "intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *La Trieste*, 40 F.3d at 590; *accord Harlen Assocs.*, 273 F.3d at 502. Accordingly, any Equal Protection claim under that "selective enforcement" theory would also fail to survive summary judgment.

Accordingly, the Court grants summary judgment in favor of defendants as to plaintiff's Fourteenth Amendment Equal Protection claim.

### 4. Claim Based upon 1997 Permit Application

As noted *supra,* in his reply papers, Nasca appears to change the theory under which he asserts a Fourth Amendment/Due Process claim. In particular, plaintiff claims that, in 1997, the Town failed to either approve or deny his application for a renewal of an accessory apartment permit and simply never acted on it. Plaintiff argues:

> Defendant Town of Brookhaven violated Plaintiff's procedural due process rights. Defendant Town of Brookhaven had information it believed did not allow me the right to have an Accessory Apartment permit, but instead of providing me notice of this information and giving me the opportunity to refute this information, they chose to do nothing. Failing to provide me a hearing and failing to either approve or deny the renewal application deprived your deponent of my due process rights to seek the appropriate legal relief from denial of my application.

(Nasca Reply Affidavit, at ¶ 19.) As discussed below, this claim fails as a matter of law on several grounds.

As a threshold matter, the Court reiterates that, in his complaint, plaintiff fails to allege any claim for "failure to act" on his 1997 renewal application under the Fourth or Fifth Amendment. In fact, plaintiff never mentioned this 1997 incident anywhere in his complaint. Although the Court will address this new claim, the Court notes that plaintiff's failure to include these allegations in the complaint renders such allegations improper. *See, e.g., Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion."); *see also DeFilippo v. N.Y.S. Unified Court Sys.,* No. 06-1561-CV, 2007 WL 1174135, at *1 (2d Cir. Apr. 19, 2007) ("[T]he District Court did not abuse its discretion in prohibiting DeFilippo from raising a due process claim for the first time in his opposition to defendants' summary judgment motion."); *Beckman v. U.S. Postal Serv.,* 79 F. Supp. 2d 394, 407-08 (S.D.N.Y. 2000) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'") (citations omitted) (collecting cases).

Second, any attempt to assert a Section 1983 claim based upon alleged wrongful conduct in 1997 would be barred by the applicable three-year statute of limitations. *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002), *cert. denied*, 538 U.S. 922 (2003).

Finally, this claim also fails to survive summary judgment on the merits. To the

extent that Nasca claims that his Fourth Amendment/Due Process rights were violated when defendants failed to act on his permit application, there is no legal or factual basis in the record to support such a claim.[8] With respect to the Fourth Amendment, it is beyond cavil that there can be no Fourth Amendment violation in the absence of a search or seizure. Thus, given that the failure to act upon an permit application certainly does not involve a search or seizure, the Fourth Amendment is not implicated. Similarly, with respect to any alleged Due Process violation, plaintiff cannot assert a cognizable Due Process claim under the facts of this case where the Town took no action with respect to his application and he never sought to avail himself of any process whatsoever given the Town's non-response. As one court has noted,

> A plaintiff, however, cannot make an application to the city for some type of approval or permit and sit idly by. Self-help must be used if he wants to use a § 1983 case to protect his property rights. The mere filing of an application followed by inaction by the governmental agency, in and of itself, is not sufficient to maintain a § 1983 action. If the governmental agency does not act in a reasonable, timely, expeditious manner, the property owner must aggressively and affirmatively assert his rights. By doing so, he is in the best possible position to assert the inadequacy of the state procedures and, thus, a violation of his constitutional rights should the governmental agency remain intransigent.

*Eaton v. Solon,* 598 F. Supp. 1505, 1512 (D. Ohio 1984); *see also R-Goshen LLC v. Village of Goshen,* 289 F. Supp. 2d 441 (S.D.N.Y. 2003) (holding that plaintiff's "unreasonable delay" claim for failure to act on his application to develop property could not survive summary judgment where plaintiff did nothing in response to inaction). Here, plaintiff alleges that he submitted his application for renewal of his accessory

---

[8] As an initial matter, defendants argue that this claim is frivolous because plaintiff was not even eligible for such a permit because, in order to obtain the permit, he needed to be an owner-occupant of the premises, and plaintiff admitted in his deposition that, although he stayed at the premises from time to time in 1997, he was not living there. Plaintiff counters that it is his "subjective intent" that defines where his principal residence is located and, thus, he could have qualified for the permit. However, the Court need not address this issue because, for the reasons set forth below, plaintiff's claim that the failure to either approve or deny his renewal application violated his constitutional rights cannot survive summary judgment on other grounds. Similarly, plaintiff's collateral claim that the law improperly required him to consent to a warrantless inspection of the residence to get the 1997 renewal (which was not raised in his complaint) is without merit. Although plaintiff concedes that there is no such requirement in the law, he asserts that there is a policy, custom, and practice of requiring such inspections. Plaintiff's belief that his failure to consent to an inspection was the reason his application was not acted upon (as opposed to an administrative oversight or some other reason) is based on sheer speculation and does not provide any grounds for asserting a constitutional violation in the instant case. Thus, to the extent plaintiff is attempting to assert some type of claim for municipal liability on this or other grounds, there is no evidence to support it.

apartment permit in 1997 and never heard about it again from the Town. In fact, at oral argument, plaintiff acknowledged that he forgot about the application once he submitted it. Moreover, plaintiff continued to rent the apartment while his application was pending and made no inquiry concerning the status of his application. There is absolutely no legal or factual basis for plaintiff to prevail on a Due Process claim given these undisputed facts and the complete absence of any harm or deprivation to plaintiff. Accordingly, Nasca's Fourth Amendment/Due Process claim based upon his 1997 application for renewal of his permit cannot survive summary judgment.

C. Plaintiff's Claims Arising Under 42 U.S.C. §§ 1982, 1985, and 1986

Plaintiff also alleges that defendants discriminated against him in violation of 42 U.S.C. §§ 1982, 1985, and 1986.[9] As set forth below, summary judgment is warranted on all of these claims because plaintiff has failed to even allege racially discriminatory intent or that he is a member of racially protected class, and certainly has provided no evidence that would allow any of these claims to survive summary judgment.

Under 42 U.S.C. § 1982, that "[a]ll citizens . . . shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." "While § 1982 does not use the phrase 'discrimination based on race,' that is its plain meaning." *Gomez-Perez v. Potter*, 128 S.Ct. 1931, 1936 (May 27, 2008); *see also Shaare Tefilia v. Cobb,* 481 U.S. 615, 616 (1987) ("The section forbids both official and private racially discriminatory interference with property rights."). "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993.) Plaintiff has failed to provide evidence or even allege that he is a member of a racial minority. Similarly, plaintiff has failed to allege or provide evidence that there was an intention by the Town to discriminate on the basis of race. Therefore, summary judgment for defendants on the Section 1982 claim is appropriate.

Section 1985(3) prohibits two or more persons from conspiring for the purpose of depriving any person of the equal protection of the laws, or of equal privileges and immunities under the laws. In order to establish a claim under § 1985(3), plaintiff must meet four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; [and] (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Main,* 7 F.3d at 1087. The conspiracy must be motivated "by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (quoting *United Bhd. of Carpenters, Local 610 v. Scott,* 463 U.S. 825, 829 (1983)). Because plaintiff fails to even

---

[9] Although plaintiff has failed to specify which subsection of 42 U.S.C. § 1985 he brings his claim under, it is clear from the facts that only § 1985(3) would be potentially applicable to the present case. (*See* Compl. ¶ 32-34.)

17

allege any racial or class-based animus, and there is certainly no evidence of such, defendants are entitled to summary judgment on plaintiff's § 1985 claim.

Defendants are also entitled to summary judgment on plaintiff's § 1986 claim because "a § 1986 claim must be predicated upon a valid § 1985 claim." *Mian,* 7 F.3d at 1088; *see also Lehman v. Kornblau,* 134 F. Supp. 2d. 281, 289 (E.D.N.Y. 2001) (dismissing § 1986 claim where no valid § 1985 claim exists); *Altshuler v. Univ. of Pa. Law School,* No. 95 Civ. 249 (LLS), 1997 WL 129394, at *17 (S.D.N.Y. 1997) (same); *Augustine v. Reid,* 882 F. Supp. 50, 54 (E.D.N.Y. 1995) (same).

Accordingly, summary judgment for the defendants is warranted on the claims under Sections 1982, 1985, and 1986.

### D. Substantive Due Process

Nasca also claims in a cursory fashion that defendants' actions violated his substantive due process rights based upon the defendants' use of a Cole's Directory to determine the identity of residents at the Plaza Lane premises. Defendants, however, are entitled to summary judgment on any such claim.

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable." *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005). "In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* (quoting *Country of Sacramento v. Lewis,* 523 U.S. 833, 847 n.8 (1998)).

Here, defendants simply utilized a reverse phone book search in an effort to determine whether Nasca resided at the Plaza Lane premises. The defendants' alleged actions were not improper in any way and do not come anywhere close to meeting the standard of "shocking the conscience." This claim is simply frivolous. Therefore, to the extent that plaintiff asserts a Section 1983 claim as a result of a Fourteenth Amendment substantive due process violation, summary judgment is warranted for the defendants.

### E. Pendent State Claims

In addition to the §§ 1982, 1983, 1985, and 1986 claims, plaintiff asserts state law claims for violations of his constitutional rights under the New York State Constitution and trespass laws. "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir.1986)). Therefore, in the instant case, the Court, in its discretion, "decline[s] to exercise supplemental jurisdiction over [plaintiffs'] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 121-22 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are

dismissed before trial . . . the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.*, No. 99 Civ. 3608 (WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court."). Accordingly, pursuant to 42 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state claims given the absence of any federal claims that survive summary judgment, and dismisses such state claims without prejudice.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in its entirety with respect to the federal claims. The Court declines to exercise supplemental jurisdiction over the state claims and, thus, the state claims are dismissed without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 25, 2008
Central Islip, NY

\*\*\*

Plaintiff appears *pro se.* The attorney for defendants is Geoffrey H. Pforr of Kral, Clerkin, Redmond, Ryan, Perry & Girvan, LLP, 496 Smithtown Bypass, Suite 204, Smithtown, New York, 11787.